

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8065 | **DATE** | 4/2/2002 |
| **CASE TITLE** | Melvin Jessup vs. National Railroad Passenger Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendant's motion for summary judgment is granted in its entirety, and this action is dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SN | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MELVIN JESSUP,                        )
                                      )
         Plaintiff,                   )
                                      )
    v.                                ) No. 00 C 8065
                                      )
NATIONAL RAILROAD PASSENGER           )
CORPORATION,                          )
                                      )
         Defendant.                   )

DOCKETED
APR - 3 2002

MEMORANDUM OPINION AND ORDER

Melvin Jessup ("Jessup") has charged his former employer National Railroad Passenger Corporation ("Amtrak") with employment discrimination actionable under Title VII (42 U.S.C. §§2000e to 2000e-17) and the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. §§621-634). Amtrak has filed a Fed. R. Civ. P. ("Rule") 56 motion for summary judgment, and both sides have complied with this District Court's LR 56.1.[1] For the reasons contained in this memorandum opinion and order, Amtrak's motion is granted in its entirety and this action is dismissed.

---

[1] LR 56.1 is designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Amtrak's LR 56.1(a)(3) statement as "A. St. ¶ -" and to Jessup's LR 56.1(b)(3)(B) statement of additional facts as "J. St. ¶ -." Jessup's Response to Amtrak's LR 56.1(a)(3) statement is cited as "J. Resp. ¶ -," although where an A. St. assertion is not controverted a citation to the latter ordinarily suffices. "A. Rep." designates Amtrak's Reply statement. This opinion employs the same "A." and "J." abbreviations in referring to the parties' exhibits and memoranda.

## Summary Judgment Standards

Familiar Rule 56 principles impose on Amtrak the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (St. Louis N. Joint Venture v. P & L Enters., Inc., 116 F.3d 262, 265 n.2 (7th Cir. 1997)). As Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999) has quoted from Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 149 (7th Cir. 1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

As with any summary judgment motion, this Court accepts nonmovant Jessup's version of any disputed facts, but only so long as it is supported by record evidence. What follows in the Facts section is culled from the parties' submissions in that manner.[2]

---

[2] Jessup has filed a separate motion to strike certain portions of Amtrak's LR 56.1 statement, arguing that the disciplinary hearing transcripts on which Amtrak relies are inadmissible hearsay because the testimony was not taken under oath. That motion is rejected for more than one reason. Most importantly, each witness relied on by Amtrak provided an affidavit (Kelly Aff., Krueger Aff., Rush Aff.) stating that the transcript accurately reflects his testimony and that his testimony was true, thus removing any hearsay objection under Rule 56(e). Although Jessup's counsel has argued otherwise in her just-filed Reply Brief on the subject, she is flat-out wrong--each witness' affidavit is the equivalent of a current

2

## Background

Jessup began working for Amtrak in 1987 as an assistant conductor, and he worked for the company as both an assistant conductor and a conductor until his termination on October 22, 1998 (A. St. ¶¶5-6). Throughout his employment with Amtrak Jessup was a member of the United Transportation Union ("UTU") (id. ¶9). One of his responsibilities was distributing service vouchers known as Arrow vouchers (J. St. ¶¶88-90). Those were given to passengers who were inconvenienced by poor service, and each could be credited against the purchase of a ticket for the amount stated on the voucher (A. St. ¶¶12, 13). Arrow vouchers were not issued in the name of any particular passenger (id. ¶15).

In May 1998 Amtrak's Inspector General's Office ("IG Office") began an investigation of whether Jessup had provided Arrow vouchers to unauthorized persons (id. ¶¶19-20). Three instances of alleged misuse were discovered.

---

under-oath reiteration of the earlier testimony. Second, Amtrak's response to Jessup's motion asserts that the transcripts are offered not to show the truth of the underlying testimony but to show what motivated Amtrak's employment decisions, so that they are admissible non-hearsay (Fed. R. Evid. 801(c)). Even were that not so as to some portions of the testimony (a question that need not be answered under the circumstances), Jessup's motion to strike is dead in the water for the reason stated earlier in this footnote in any event. Third (a partial reason), several of the paragraphs to which Jessup objects (A. St. ¶¶12, 13, 21, 39) are based on Amtrak's responses to Jessup's Request for Admission of Facts and are thus also non-hearsay.

First, Jessup's daughter Kristin submitted fifteen vouchers worth $50 each to an Amtrak ticket agent as payment for two round-trip tickets from Chicago to Los Angeles for her friends (id. ¶21). Because both tickets were issued in her name, Kristin later asked Amtrak to get the names changed (J. St. ¶112). When she was told that the names could not be changed and that the vouchers should not have been used to purchase the tickets, she returned them unused to Amtrak's customer relations department (id. ¶113).[3]

Second, Jessup gave expired vouchers worth $150 to an Amtrak ticket agent named Janet Jackson ("Jackson") (id. ¶¶120, 127). Jackson received approval from Amtrak to use the expired vouchers, and she obtained a ticket discounted by $150 for a friend (id. ¶¶123-25, 127). As discussed below, Jackson was

---

[3] A. Rep. ¶¶112-13 contests J. St. ¶¶112-13 as based on purportedly inadmissible hearsay--the sworn testimony of Kristin Jessup before a court reporter (J. Ex. 5). Although that testimony is labeled as a "deposition," Amtrak complains that it is in violation of the Rules because it was taken without notice to Amtrak's counsel. Be that as it may, the cases cited by Amtrak--cases that state the unexceptional proposition that a document labeled as an affidavit but unsigned by the affiant does not satisfy Rule 56(e)--are irrelevant to, and in no way impair, the use of a sworn statement such as J. Ex. 5. Nor is Amtrak's invocation of 28 U.S.C. §1746, which deals with the use of unsworn declarations, at all relevant. Here the Kristin Jessup statement was given under oath (and was expressly so certified by the court reporter)--it is surely of no moment that Tr. 14, part of the court reporter's certification, says "The signature of the witness was waived by agreement" but that Amtrak was not one of those so agreeing. In candor, Amtrak's contention is unworthy of its able counsel.

4

investigated and ultimately terminated for her involvement in that scheme (though she was later reinstated with a loss of back pay).

Third, Jessup mailed service vouchers to his friend Richard Brooks ("Brooks") (A. St. ¶39). When Brooks attempted to use the two $25 vouchers to purchase a ticket at the Amtrak station in Niles, Michigan, the ticket agent called the police (id.). That led to a police report, a copy of which was later sent to the IG Office (A. St. ¶41, A. Ex. A at Hearing Ex. F). When the IG Office then interviewed Brooks, he acknowledged that he was not an inconvenienced passenger and that Jessup had mailed him the vouchers (A. St. ¶¶43-44).

Based on Jackson's use of the vouchers she received from Jessup, Amtrak charged her with violating the Trust and Honesty provision of Amtrak's Standards of Excellence (id. ¶48). On August 5, 1998 a disciplinary hearing was held before hearing officer Carl Demotses ("Demotses") (id. ¶49). At the hearing Jessup testified that although he could not recall how many, he had given Jackson service vouchers to use for a friend (id. ¶51, A. Ex. C 50, 53, 58). Demotses ruled that the charge against Jackson had been proved, and she was discharged on August 13 (A. St. ¶¶76-77).

Jackson's union, Transportation Communications Union ("TCU"), then filed an internal second-level appeal to Amtrak's

5

labor relations field office (id. ¶¶17, 25; J. St. ¶100). After that appeal was denied, TCU initiated a third-level appeal to Amtrak's Director of Labor Relations responsible for TCU's labor contract, LaVerne Miller ("Miller") (A. St. ¶¶17, 78). That appeal was also denied (id. ¶78). But in November 1999 Miller decided to reinstate Jackson on a leniency basis, which requires that an employee admit guilt to the charges involved and that the employee or his or her union request reinstatement without back pay (id. ¶¶80-81). Though Amtrak maintains that TCU asked Miller to consider leniency reinstatement (id. ¶79), Jessup insists that it was Amtrak that offered to reinstate Jackson (J. Resp. ¶79, J. St. ¶103[4]).

Meanwhile Amtrak also filed charges against Jessup, and a disciplinary hearing was held on October 13, 1998 before hearing officer Demotses (A. St. ¶¶55-56). In addition to violation of the Trust and Honesty provision, Jessup was also charged with violating the Conduct provision prohibiting employees from engaging in dishonest behavior (J. Dep. Ex. 15). Demotses also

---

[4] Those Jessup submissions really do not identify evidence to support his insistence. Indeed, while Amtrak-TCU correspondence reflects that a conference was held where TCU and Amtrak agreed to leniency reinstatement, none of the correspondence in the record reveals which party made the initial proposal (J. Ex. 19, A. Resp. ¶103). In support of Amtrak's position, however, Miller testified that TCU representative Dan Biggs requested Jackson's leniency reinstatement in a telephone conversation with another Amtrak manager (A. Ex. 2 at 25-26). All the same, to avoid any question this opinion will arguendo credit Jessup's position (it turns out to make no difference in the result here).

6

ruled that the charges against Jessup had been proved, and Jessup was discharged on October 22 (A. St. ¶¶65, 68; J. St. ¶93).

As Jackson's union had done on her behalf, UTU filed a second-level appeal on Jessup's behalf with the Manager of Labor Relations. That appeal was denied on November 24, 1998 (A. St. ¶¶17, 70), as was UTU's third-level appeal to the Director of Labor Relations responsible for the UTU conductors' labor contract, Larry Hriczak ("Hriczak") (id. ¶71). Unlike Jackson's union, UTU next appealed Jessup's termination to the Public Law Board, a three-member arbitration panel, which decided on July 31, 2000 to uphold the termination (id. 74-75).

On July 21, 2000 Jessup filed a Charge of Discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission, targeting Amtrak with asserted age-based and sex-based discrimination (Complaint ¶2). After he received a right-to-sue letter, he timely filed this action (id.).[5]

---

[5] Jessup contends that both his termination and Amtrak's failure to reinstate him were discriminatory (J. Mem. 1). But Jackson, the only comparator he identified, was also terminated. Because Jessup has no direct evidence that his termination was discriminatory and because he has not pointed to any employee involved in misusing service vouchers who was not terminated, his throwaway discriminatory termination argument fails at the outset (Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 650 (7th Cir. 2001)). This opinion therefore subjects only Jessup's failure-to-reinstate claim to analysis.

7

## Sex Discrimination Claim

Sex discrimination can be established in one of two ways: with direct or circumstantial evidence that the adverse employment actions would not have been taken but for plaintiff's sex (the so-called direct method), or with the burden-shifting and inference-creating method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973) (Mojica v. Gannett Co., Inc., 7 F.3d 552, 561 (7th Cir. 1993) (en banc)). Here Jessup attempts the burden-shifting approach.

There is no need to rehearse the oft-repeated steps entailed in that process. Indeed, there is no need to dance that quadrille here--as this Court (like others) has noted more than once (e.g., Moore v. NutraSweet Co., 836 F. Supp. 1387, 1395 (N.D. Ill. 1993) (internal quotation marks omitted)):

> [T]he plaintiff's prima facie showing in these cases frequently cannot be analyzed wholly discretely from the plaintiff's showing of pretext, so that it is preferable to collapse the inquiry and focus on the showing of pretext, a position that our Court of Appeals also has taken on occasion (see, e.g., its decision affirming this Court in McCoy [v. WGN Cont'l Broad. Co., 957 F.2d [368,] 372 [(7th Cir. 1992)]).

And our Court of Appeals has continued to follow that approach where appropriate, jumping ahead to the ultimate discrimination question rather than focusing on the prima facie case even when it is questionable whether plaintiff has met the latter requirement (see, e.g., Olsen v. Marshall & Ilsley Corp., 267

8

F.3d 597, 600-01 (7th Cir. 2001)).⁶ This opinion likewise turns directly to whether Jessup has met his burden of creating a reasonable inference that Amtrak's stated reasons for refusing to reinstate him were a pretext for intentional discrimination.

To establish pretext, Jessup must ultimately show by a preponderance of the evidence either (1) that Amtrak was more likely motivated by a discriminatory reason than by its proffered reasons or (2) that its proffered reasons are unworthy of credence (McCoy, 957 F.2d at 372).⁷ But Jessup offers no facts that could undermine Amtrak's articulated reasons for refusing to reinstate him, so as potentially to convince a reasonable jury that Amtrak's explanation is a pretext for discrimination.

Amtrak gives essentially two reasons for failing to reinstate Jessup. First, it contends that unlike Jackson he never specifically requested leniency reinstatement, which Amtrak argues is more than a "simple request for reemployment" (A. Mem.

---

⁶ Only a week ago our Court of Appeals explored the limited circumstances under which an employee could invoke a similar shortcut of the McDonnell Douglas approach (Brummett v. Lee Enters., Inc., No. 01-2535, 2002 WL 449698, at *2 (7th Cir. Mar. 25)). But what is said in the text remains an accurate statement of the procedure in aid of an employer's Rule 56 motion.

⁷ At this summary judgment stage, of course, Jessup need not "establish" or "prove" or "show" anything. Instead he must merely demonstrate the existence of a genuine issue of material fact to defeat Amtrak's summary judgment motion. Although this opinion will nonetheless most frequently employ one of those quoted terms because that is the terminology used by the cited cases, this Court has consistently imposed that lesser burden on Jessup in testing his claims.

9

7, A. R. Mem. 9). Second, it maintains that refusing to grant Jessup's requests for reinstatement throughout the internal appeals process was justified by sufficient evidence of misconduct (A. R. Mem. 9).

On the first issue, Amtrak asserts that it did not reinstate Jessup on a leniency basis because neither he nor his union so requested and because Jessup has never admitted guilt, a prerequisite to a grant of leniency (A. Mem. 7, A. St. ¶80). Jessup has presented no evidence to show either that he has admitted guilt or that he in fact requested a leniency reinstatement. Instead he argues that he should not have had to use the "majic words" [sic] of "reinstatement based upon leniency" for Amtrak to consider that option (J. Mem. 19).

Jessup attempts to point to the affidavit of UTU Vice General Chairman Roger Lenfest ("Lenfest") as supporting Jessup's contention that "on several occasions Amtrak has reinstated employees without a specific request for leniency" (id.). Not so--Lenfest's affidavit simply says:

> On prior occasions, Amtrak has reinstated employees on a leniency basis.

Lenfest's affidavit includes nothing about whether reinstatements were made in the absence of employee or union requests, as Jessup improperly suggests. Moreover, a February 2000 letter from Hriczak to Jessup had instructed him precisely how to make a request for leniency if he felt some discipline short of

10

dismissal should be considered (J. Ex. 21):

> If the nature of the inquiry is whether some discipline short of dismissal, such as lengthy suspension, resignation, payback, or schooling should be considered as the discipline, that inquiry would be a request for leniency, which should be made to the Chief Operating Officer of Amtrak Intercity.

Although as indicated earlier the parties disagree about whether Jackson's union requested reinstatement based on leniency (as Amtrak posits) or whether Amtrak itself proposed her reinstatement (as Jessup states, albeit without appropriate supporting evidence--see n. 4), that dispute is not material and does not preclude granting summary judgment. Even if Amtrak had approached Jackson regarding leniency (crediting Jessup's version, as n. 4 says), this Court cannot sit as a super personnel manager and re-examine Amtrak's legitimate business decision to seek to reinstate one but not the other (Brasic v. Heinemann's Inc., 121 F.3d 281, 287 (7th Cir. 1997)). On the contrary, although Jessup has demonstrated some likeness to Jackson in that they both misused service vouchers, Jessup differs from Jackson in several material ways that are damaging to Jessup.

First, Jessup was appropriately charged with violating both the Conduct and the Trust and Honesty provisions of Amtrak's Standards of Excellence and General Code of Operating Rules, while Jackson was charged only with the Trust and Honesty violation (J. Dep. Ex. 15, A. St. ¶48). Although Jessup contends otherwise (J. Mem. 12), Jackson was not charged with lying to the

11

IG Office when questioned about the vouchers.[8] Next, Jessup was involved in three separate incidents of misconduct involving $950 worth of vouchers and still denies wrongdoing, while Jackson admitted her actions--and they were limited to a single incident involving $150 worth of vouchers provided by Jessup himself (J. Mem. 13-15, A. Ex. D pages 2-3). Moreover, Jackson had more than twice as many years of service at Amtrak as Jessup did--23 years as compared with 11 (A. St. ¶¶5, 24).

Plainly Amtrak had legitimate reasons to consider leniency for Jackson but not for Jessup (and to offer that possibility to Jackson, if that is indeed what happened) (Kaniff v. Allstate Ins. Co., 121 F.3d 258, 265 (7th Cir. 1997)). All that is required on that score is that Amtrak honestly believed it was appropriate to put Jackson but not Jessup back to work (Flores v. Preferred Technical Group, 182 F.3d 512, 516 (7th Cir. 1999)). Abundant testimony from Jessup's disciplinary hearing supports Amtrak's assertion that Jessup's termination was upheld based on its honestly held belief that Jessup misused service vouchers and lied about it to IG investigators.[9] Moreover, Jessup admitted

---

[8] In addition to being formally charged with dishonest conduct, Jessup's Notice of Formal Investigation specifies "[f]urthermore, it is alleged that you were dishonest with Amtrak's Inspector Generals [sic] Office when questioned about your involvement in the above mentioned service vouchers" (J. Dep. Ex. 15 at 2). Jackson's Notice makes no mention whatever of dishonest statements to IG investigators (A. Ex. C at Hearing Ex. A).

[9] By way of example, Agent Krueger testified that (1) Kristin Jessup submitted 15 service vouchers worth $750 to an

12

that neither hearing officer Demotses (who found him guilty of the charges) nor General Manager Steve McClarty (who later made the decision to terminate him) nor Manager of Labor Relations Valorie Giulian (who denied his second-level appeal) discriminated against him on the basis of his sex or age (A. St. ¶¶67-70; J. Dep. 108-12 ). And he does not even dispute that Hriczak denied his third-level appeal because "the record contained substantial evidence of probative value that he committed the infractions with which he was charged" (A. St. ¶73).

That different decisionmakers made the determinations to allow Jackson's leniency reinstatement and to deny Jessup's third-level appeal further belies any inference of discrimination (Radue v. Kimberly Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000); Timms v. Frank, 953 F.2d 281 (7th Cir. 1992)). It was Miller who denied Jackson's third-level appeal and later decided

---

Amtrak ticket agent as payment for two train tickets, (2) Jessup provided Jackson with $150 worth of service vouchers upon Jackson's request and (3) Jessup mailed Brooks vouchers worth $50, which Brooks attempted to use towards the purchase of a ticket (A. Ex. A at 23-24, 27). Jessup attempted to provide an explanation for each incident, testifying that (1) he never gave service vouchers to his daughter--instead it was his son who took the vouchers without Jessup's knowledge and gave them to someone who forged his daughter's name; (2) he was not aware that Jackson's use of the vouchers would be improper, although he knew she planned to use them to discount a fare for a friend; and (3) the vouchers he sent to Brooks were intended only as "railroad memorabilia" (A. Ex. A 92-93, 100, 109, 128). Demotses permissibly found that Jessup's testimony was "almost completely devoid of any degree of credibility," while the testimony of Krueger and Amtrak's other witnesses was found to be credible (A. Ex. B at 4).

to reinstate her (A. St. ¶78, J. Resp. ¶81). But Jessup's third-level appeal was denied by Hriczak, who unlike Miller also sat on Jessup's Public Law Board arbitration panel (A. St. ¶71, J. St. ¶96). Different supervisors making different employment decisions concerning different employees present "distinctions sufficient [to] account for any disparity in treatment, thereby preventing an inference of discrimination" (Radue, 219 F.3d at 618).

Even if it were to be assumed that Jessup's asserted requests to the Public Law Board that he "be reinstated to [his] employment just like Janet Jackson" (J. Ex. 9 ¶9) and that he "be treated no worse then Amtrak had treated Janet Jackson" (Lenfest Aff. ¶13) amounted to a request for reinstatement based on leniency,[10] Amtrak would have been fully justified in refusing the request for the reasons discussed in the preceding paragraphs. Thus even when all favorable inferences are drawn in Jessup's favor, Amtrak's treatment of Jackson does not raise an inference that sex was a factor in Jessup's termination.

In fact, Jessup's reference to the Public Law Board raises what might fairly be viewed as an independent basis for rejecting his claim. After all, when it came to the issue of his possible reinstatement, it was the Board that was really the ultimate

---

[10] Such an assumption would be at odds with the evidence, for Jessup's own brief to the Public Law Board requests that Jessup be treated _better_ than Jackson by receiving back pay (J. Ex. 10 at 1). That of course is contrary to the undisputed requirements for leniency reinstatement.

14

decisionmaker, not Amtrak alone. When the Board refused to award reinstatement even though it was apprised that Jackson had been granted that relief, it did engage in admittedly discriminatory (that is, different) treatment--but there is no suggestion by Jessup that the difference was in any way sex-based or age-based. Instead Jessup acknowledged in his deposition (Tr. 108-12) that the Board's neutral members and Chairman had not discriminated against him. But because this opinion demonstrates more than ample reasons for Amtrak's victory without this line of analysis, this paragraph has been inserted only as a sort of supplement to the other grounds for decision.

Amtrak's second articulated reason, that the evidence substantiated the charges against Jessup and justified denying his internal appeals, has been sufficiently addressed by the above analysis. Jessup has plainly failed to create a material issue of fact as to whether his appeals were actually denied because of his sex. Significantly in that respect, Jackson's appeals were denied as well (J. St. ¶100). Jessup cannot plausibly claim discrimination based on the denial of his internal appeals when those of his sole comparator were also denied.

In sum, Jessup has presented no evidence that a reasonable jury could view as tending to show that Amtrak's stated reasons for refusing to reinstate him were a "sham"--that is, no evidence that Amtrak did not honestly believe Jessup had misused service vouchers and lied about it. Accordingly Amtrak's summary

15

judgment motion must be and is granted as to Jessup's Title VII claim.

## Age Discrimination Claim

Jessup's age discrimination claim fails for the same reason as his Title VII claim: Nothing even hints that Amtrak's stated reasons for failing to reinstate him were pretextual. While that alone suffices to defeat his ADEA claim, Jessup also unquestionably fails to make out a prima facie case of age discrimination. Such a prima facie case requires a showing that (1) he was a member of the protected class (age 40 or over), (2) he was performing his job satisfactorily, (3) he was subjected to a materially adverse employment action and (4) substantially younger and similarly situated employees were treated more favorably (Bennington v. Caterpillar Inc., 275 F.3d 654 (7th Cir. 2001); 29 U.S.C. § 631(a)).

What has been said as to Jessup's Title VII claim is fatal as to the second of those four factors. But over and above that dispositive element, Jessup fails on the fourth factor as well. In that regard an inference of discrimination is proper only when a substantially younger person is favored over plaintiff (Scott v. Parkview Mem'l Hosp., 175 F.3d 523, 525 (7th Cir. 1999)). While a ten-year age difference between plaintiff and the favored employee is presumptively substantial, a seven-year difference

(the situation as between Jessup and Jackson[11]), has been held insufficient (on its own) to present a prima facie case of age discrimination (Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 892 (7th Cir. 1997)).

To be sure, a triable claim may still be presented through evidence that the employer viewed plaintiff's age to be significant (id. at 893; Bennington, 275 F.3d at 659). But here Jessup has presented no evidence whatever that Amtrak's decisions regarding his employment were motivated by age.[12] Hence Amtrak's summary judgment motion must be and is granted as to Jessup's ADEA claim as well.

## Conclusion

Jessup obviously believes that he was treated unfairly by Amtrak. That is (to say the least) open to serious question, but what controls here is his total inability to present evidence from which a reasonable inference of discrimination may fairly be drawn. To frame the matter in Rule 56 terms, he has not shown a

---

[11] Jessup's birthdate is January 4, 1947 (A. St. ¶4), so that when he was terminated by Amtrak in October 1998 he was 51 years old. Jackson, Jessup's sole comparator, was born on May 8, 1954 and was 44 years old at the time of her termination (A. St. ¶24).

[12] Jessup argues that Hriczak had previously discriminated against him by denying his request for a leave of absence of unlimited duration in 1997 when one had been granted to a younger employee (J. Mem. 19-20). But contrary to Jessup's assertion there is no record evidence that the younger employee's leave was for an unlimited duration (J. St. ¶140, J. Ex. 1 at 119). Jessup's unsupported contention is certainly not evidence of age-based hostility.

17

genuine issue of material (that is outcome-determinative) fact, and Amtrak is thus entitled to a judgment as a matter of law. Its summary judgment motion is granted in its entirety, and this action is dismissed with prejudice.

                                                                   _____
                                                                   Milton I. Shadur
                                                                   Senior United States District Judge

Date: April 2, 2002